# In the United States Court of Federal Claims

BID PROTEST

|  |  |  |
|---|---|---|
| AAR GOVERNMENT SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  25-1488C |
| v. | ) | (Filed Under Seal: February 6, 2026 |
| | ) | Reissued: February 25, 2026)* |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| V2X AEROSPACE LLC, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

Caitlin Therese Conroy, Steptoe LLP, Washington, DC, with whom were Paul R. Hurst, Anna M. Menzel, and Shannon Reid, Of Counsel, for Plaintiff.

Blake William Cowman, U.S. Department of Justice, Washington, DC, with whom were Corinne A. Niosi, Patricia M. McCarthy, and Brett A. Shumate, for Defendant. LeDara Y. Clark and Maj. Princess Gaye, United States Air Force, Joint Base Andrews, MD, Of Counsel.

Kayleigh Marie Scalzo, Covington & Burling LLP, Washington, DC, with whom were Jason A. Carey, J. Hunter Bennett, Andrew R. Guy, and Victoria A. Skiera, Of Counsel, for Defendant-Intervenor.

## OPINION AND ORDER

**KAPLAN, Judge.**

In this post-award bid protest, Plaintiff AAR Government Services, Inc. ("AAR") challenges the decision of the United States Air Force (the "Air Force," or "Agency") to award Defendant-Intervenor V2X Aerospace LLC ("Vertex") a contract to provide Contractor Operated and Maintained Base Supply ("COMBS") services under Request for Proposals ("RFP") No. FA8106-23-R-1000 (the "Solicitation"). AAR contends that the Agency's price reasonableness analysis, its evaluation of AAR's past performance, its evaluation of Vertex's past performance,

---

\* This opinion was originally issued under seal, and the parties were given the opportunity to request redactions. Each party requested redactions which the Court has adopted.

and its best value determination were arbitrary and capricious. See generally Pl.'s Mot. for J. on the Admin. Rec, ECF No. 39 [hereinafter Pl.'s MJAR].

On January 30, 2026, the Court ruled on the parties' cross-motions for judgment on the administrative record ("MJARs"), denying AAR's motion and granting the motions of the government and Vertex. ECF No. 47. What follows is an explanation of that ruling.

**BACKGROUND**

## I.      The Solicitation

### A.      Overview

This protest arose out of the Air Force's award of the COMBS IV contract to Vertex. The RFP sought proposals for the provision of COMBS services for a fleet of over seven hundred military aircraft across a dozen locations, including bases and depots in the southern United States. AR Tab 61 at 68076. Contractors would be required to "provide a full spectrum of transparent Supply Chain Management [] services to support safe, flyable aircraft to meet users' daily flight schedule and depot requirements." AR Tab 79 at 72090. These services, which the Air Force has deemed "mission essential," included "managing supply and demand, sourcing parts, assembly, disposal, warehousing and inventory tracking, order entry and order management, distribution across all channels, and delivery to the customer." Id.

The Solicitation anticipated the award of a single, firm-fixed price, indefinite delivery/indefinite quantity contract with a five-year base period, a four-year option period, and a six-month option to extend services. AR Tab 61 at 68076–77. An award would be made to the offeror that represented the best value to the government. AR Tab 71b at 71827. The RFP cautioned that the best value determination "may result in an award to a higher rated, higher priced Offeror, where the decision is consistent with the evaluation factors, and the Source Selection Authority (SSA) reasonably determines the technically acceptable proposal, and superior past performance of the higher priced offeror outweighs the price difference with lower priced offerors." Id.

### B.      Evaluation Factors

Proposals would be evaluated under three factors: Factor 1: Technical; Factor 2: Past Performance; and Factor 3: Price. Id. at 71829. "Technical acceptability [would be] a prerequisite to the best value analysis and potential trade-off between Past Performance and Price. Id. Further, "for all technically acceptable proposals," the Past Performance factor would be considered "significantly more important" than Price. Id.

#### 1.      Technical Evaluation

The evaluation of the Technical factor would be based on three subfactors: Program Management, Supply Chain Management, and Inventory Data Management and Reporting. The proposal would be rated either acceptable or unacceptable. Id. at 71829–31. "[T]echnical acceptability [was] a prerequisite to the best value analysis and potential trade-off between Past

Performance and Price." AR Tab 36k at 975; see also AR Tab 82 at 74304–06 (proposal instructions for Technical factor).

### 2.    Past Performance

The Past Performance evaluation was designed to assess "the degree of confidence the [Air Force had] in an offeror's ability to supply products and services that meet users' needs, including cost and schedule, based on a demonstrated record of performance." AR Tab 71b at AR 71831. In conducting that evaluation, the Agency would consider the recency, relevancy, and quality of offerors' past performance, relying on both information the offeror provided and data obtained from other sources. Id. at 71832–35; AR Tab 82 at 74306–09.

The RFP instructed offerors to submit up to three Past Performance Information Forms ("PPIFs") for themselves and three PPIFs for each significant subcontractor. AR Tab 82 at 74308.[1] For each PPIF, offerors were to "provide a narrative explaining what aspects of the contract [were] deemed relevant to the proposed effort, and to what aspects of the proposed effort they relate." Id.[2]

Under the RFP, only recent past performance would be considered. "To be recent, the effort must have been performed during the past three (3) years." AR Tab 71b at 71832. In addition, "[i]f any part of the performance [fell] within the [three-year] timeframe, the contract in its entirety [could] be evaluated for past performance." Id.

The RFP specified that "[m]ore relevant performance [would] have a greater impact on the Performance Confidence Assessment than less relevant effort." Id. at 71835. The Agency would determine relevancy by comparing the scope, magnitude, complexity, and price of offerors' performance examples to the T-6 COMBS IV contract requirements. Id. at 71833. Scope encompassed factors such as the number of sites and subcontractors on a project. See id. Magnitude concerned the "[d]ollar value of parts managed," "[s]ize of parts inventory managed," "[s]ize of aircraft fleet(s)," and "[c]ontract value." Id. at 71834. Complexity would be "based on, but not limited to, the similarities between a given Past Performance effort and the technical subfactors." Id. Finally, relevancy concerning price would be assessed primarily based on the similarity of the contract type to the COMBS requirement. Id.

Each past performance example would be assigned an overall relevancy rating as follows:

---

[1] The RFP defined a "significant subcontractor" as "a contractor who is proposed to perform over 5% of the total effort, or a contractor who is proposed to perform less than 5% of the total effort but is determined to be performing a critical function." AR Tab 82 at 74308.

[2] "The requested number of PPIFs for the prime and subcontractors are preferences and not requirements. Offerors may submit more than the preferred number if the Offeror believes the extra contracts are needed to fully describe their relevancy." AR Tab 82 at 74308.

| Degree | Description |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

Id. at 71833.

To evaluate performance quality, the Agency would conduct an "in-depth evaluation of the past performance questionnaire responses, [Past Performance Information Retrieval System] information, Contractor Performance Assessment Reports (CPARS) (including ratings and supporting narratives), interviews with Government customers and fee determining officials and, if applicable, commercial clients." Id. at 71834. Should an evaluation uncover adverse findings—defined as "past performance information which the Government determines to be less than satisfactory performance quality"—the Agency would "consider the number and severity of the problem(s), mitigating circumstances, and the effectiveness of corrective actions that have resulted in sustained improvements." Id. Each contract would be assigned a score of "Exceptional," "Satisfactory," "Marginal," "Unsatisfactory," or "Unknown," as depicted in the chart below. Id.

4

| Quality Assessment | Description |
|---|---|
| Exceptional | During the contract period, contractor performance is meeting (or met) all contract requirements and consistently exceeding (or exceeded) some or many. Very few, if any, minor problems encountered. Contractor took immediate and effective corrective action. |
| Satisfactory | During the contract period, contractor performance is meeting (or met) all contract requirements. For any problems encountered, contractor took effective corrective action. |
| Marginal | During the contract period, contractor performance is not meeting (or did not meet) some contract requirements. For problems encountered, corrective action appeared only marginally effective, not effective, or not fully implemented. Customer involvement was required. |
| Unsatisfactory | During the contract period, contractor performance is failing (or fail) to meet most contract requirements. Serious problems encountered. Corrective actions were either ineffective or non-existent. Extensive Customer oversight and involvement was required. |
| Unknown | Unknown Performance rating due to lack of sufficient information to assign a rating. |

Id. at 71834–35.

Ultimately, each proposal would receive one of the following performance confidence assessment ratings:

| Rating | Description |
|---|---|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

Id. at 71831–32.

### 3.  Price

The RFP stated that the Agency's Price evaluation would consider "(1) price reasonableness (including completeness), (2) unbalanced pricing, (3) price realism, and (4) Total Evaluated Price." Id. at 71835. Only the price reasonableness determination is at issue in this protest.

Under the RFP, a reasonable price would "represent a price to the Government a prudent person would pay in the conduct of competitive business." Id. at 71836. The RFP further stated that price reasonableness would "[n]ormally [be] established through adequate price competition, but may be determined through price analysis techniques as described in FAR 15.404-1(b)(2)." Id. The Agency reserved the right to also use "other techniques." Id.

The Agency requested that offerors supply pricing for 128 CLINs. See AR Tab 78 ("PRICING MATRIX" worksheet). Each CLIN price was determined by multiplying the proposed unit price by the agency-provided "best estimated evaluation quantity." Id. ("Calculation Methodology" worksheet).

For 102 of the 128 CLINs, the government developed and employed an Independent Government Estimate ("IGE") to use as a comparator in conducting its price reasonableness analysis. AR Tab 177 at 83952. The unit prices contained in the IGE were based primarily on historical prices during the option period for the predecessor COMBS III contract, "with the

addition of escalation to account for inflation/economic uncertainty and risk factors, as applicable." Id. For the remaining 26 CLINs—related to Program Management, Weekend Support, Price Per Flying Hour ("PPFH"), and Overhaul—the government employed the mean of the proposed prices it received in response to the Solicitation as a comparator, finding that methodology "more viable for comparison than the IGE" for reasons discussed in some detail in the record. Id. at 83952–55.

## II. Evaluation

### A. Establishment of the Competitive Range

Five offerors submitted initial proposals in October 2023: AAR, Vertex, [* * *], [* * *], and [* * *]. AR Tabs 87–91. Four offerors submitted revised proposals in March and April 2024: AAR, Vertex, [* * *], and [* * *]. AR Tabs 102–05. The Agency rated all four offerors' revised proposals technically unacceptable but noted that all four had "approximately the same degrees of correction potential." AR Tab 95 at 76785. With respect to Past Performance, the Agency provided confidence assessments of "Satisfactory Confidence" for AAR and Vertex and "[* * *]" for [* * *] and [* * *]. Id. at 76786. It placed the proposals of AAR, Vertex, and [* * *] in the competitive range but excluded [* * *] based on its relatively high price. See id. at 76780, 76787; see also AR Tabs 96–98 (notice of [* * *]'s exclusion and related pre-award debriefing materials).

### B. Evaluation Notices and Responses

The Agency issued initial Evaluation Notices ("ENs") to the three offerors in the competitive range on September 4, 2024. AR Tabs 133–35; see also AR Tabs 99–101 (Discussion Briefs). It also later issued follow-up ENs after receiving responses from the offerors. See, e.g., AR Tabs 142, 144, 154–58.

Four of the ENs the Agency issued bear on the protest before the Court. First, the Price Evaluation Team ("PET") issued an EN to Vertex concerning that reasonableness of its proposed prices. It identified numerous CLINs for which Vertex's unit prices appeared high when compared to the unit prices the government anticipated. AR Tab 133 at 82112–14. Vertex responded to the EN by reviewing its proposed pricing and preparing a lengthy report, in which it identified required corrections, explained them, and provided an updated pricing matrix. AR Tab 156 (Vertex – Cost Price EN Report).

The second relevant EN was prepared for AAR by the Past Performance Evaluation Team ("PPET"). It concerned AAR's alleged "marginal performance" in several areas during its performance on the [* * *] contract (the "[* * *] contract"). AR Tab 135 at 82193–94 (describing issues raised in PPQ and during interview with Evaluator and requesting additional information from AAR). AAR provided a detailed response to the concerns raised. AR Tab 159 at 82921–98.

The third EN relevant here was also issued to AAR by the PPET. It requested additional information concerning [* * *] ("[* * *]"), one of AAR's significant subcontractors, explaining that because the government had been unable to obtain past performance information for [* * *], it assigned an "Unknown" performance quality rating for the referenced contract. AR Tab 135 at

82197–98. AAR responded by supplying updated points of contact, but even so the PPET's efforts to secure further information were ultimately unsuccessful. AR Tab 159 at 82936–37.

Finally, the PPET issued Vertex an EN regarding whether the past performance efforts it had identified were of a magnitude comparable to that of the COMBS IV contract. AR Tab 165 at 83173. Specifically, it noted that the past performance examples in Vertex's proposal involved aircraft fleet sizes of 177, 17, 21, and 11, while the COMBS IV requirement involved a much larger fleet of 739 aircraft. Id. Vertex responded that although the four contracts it had identified involved a total of 226 aircraft, it was "currently provid[ing] maintenance and logistics support for more than 1,600 fixed- and rotary-wing aircraft at 200+ locations worldwide." Id. at 83174. It also supplied three additional contract examples, which it asserted "demonstrate[d] Vertex's performance and similarity in magnitude of the T-6 COMBS IV effort—accounting for over 1,000 of the aircraft [Vertex] [was] currently support[ing]." Id. at 83175.

### C.    Evaluation Results

After discussions, the three remaining offerors—AAR, Vertex, and [* * *]—submitted Final Proposal Revisions in June 2025. AR Tabs 106–108; see also AR Tabs 109–111 (Draft Final Proposal Revisions). In a July report, the Source Selection Evaluation Board ("SSEB") explained that all three proposals were rated technically acceptable. AR Tab 182 at 84448, 84452, 84457. In addition, the prices for all three proposals were determined reasonable, balanced, and realistic. Id. at 84450–51, 84455–56, 84460–61.

#### 1.    Price Reasonableness

With respect to reasonableness, the Agency determined that "adequate price competition occurred in accordance with FAR 15.403-1(c)" because there were three offerors that had been found responsible and because, "independent of each other," they had "submitt[ed] priced offers satisfying the Government's expressed requirement." AR Tab 183 at 84471. It nonetheless went on to conduct additional analyses of both CLIN unit pricing and TEP.

In analyzing CLIN unit pricing, the Agency used two techniques set forth in the FAR: (1) comparison of proposed prices received in response to the Solicitation or IGE, and (2) comparison of other than certified cost or pricing data. See, e.g., AR Tab 174 at 83721–22 (citing FAR 15.404-1). In evaluating the TEP, the pricing team employed three price reasonableness techniques contemplated by FAR 15.404-1: (1) comparison of offerors with the IGE, (2) "comparison of proposed unit prices to the unit prices received in response to the solicitation," and (3) "analysis of the data provided by the Offeror." See, e.g., id. at 83721. Based on these analyses, it found both the CLIN unit prices and TEP of all three offerors reasonable.

#### 2.    Past Performance

As to Past Performance, [* * *]'s proposal again received a "[* * *]" rating, AR Tab 182 at 84454, and AAR likewise retained the same "Satisfactory Confidence" rating that its initial proposal had been assigned, id. at 84449–50. The Agency found that "for overall relevancy, the AAR team has demonstrated a combined past performance in all areas of scope, magnitude, complexity, and price compared to the [COMBS IV contract]." Id. at 84449. Two of its

performance examples were rated "Satisfactory" for quality, one was rated "Marginal," and the third (which involved its subcontractor [* * *]) was of "Unknown" quality. Id.

The PPET noted that although one contract was rated "Marginal," AAR had supplied two other contracts "where there were no adverse performance issues, with their most relevant contract having Satisfactory performance." Id. at 84450. The PPET noted, however, that it was concerned about its inability to obtain information about performance quality for [* * *], which under AAR's proposal would be performing "a significant portion of Supply Chain Management." Id. It nonetheless found that "in regard to relevancy and quality as an aggregate the PPET has a reasonable expectation the AAR team will successfully perform the required [] COMBS IV program requirements." Id.

Vertex's rating improved from "Satisfactory Confidence" to "Substantial Confidence." Contrast id. at 84460 with AR Tab 95 at 76786. As it had found with respect to AAR, the PPET concluded that, "[f]or overall relevancy," Vertex had demonstrated "a combined past performance in all areas of scope, magnitude, complexity, and price compared to the [] COMBS IV effort." AR Tab 182 at 84460. Vertex received performance quality ratings that were all "Satisfactory," with one "Exceptional." See id. at 84459. The PPET observed that "[t]here were no adverse performance issues identified," and that it "ha[d] a high expectation the Vertex team will successfully perform the [] COMBS IV program requirements." Id. at 84460.

### D.    Award Decision

#### 1.    SSAC Recommendation

The Source Selection Advisory Council ("SSAC") reviewed each proposal and concurred with the SSEB's evaluation and documentation. AR Tab 183 at 84463. The table below shows the final ratings the SSAC approved for each of the three offerors under the technical and past performance factors, as well as the TEPs of those proposals.

| Offeror | AAR | [* * *] | Vertex |
|---|---|---|---|
| Factor 1 Technical | Acceptable | [* * *] | Acceptable |
| Factor 2 Past Performance | Satisfactory | [* * *] | Substantial |
| Factor 3 Price | $3,498,802,526.55 | $[* * *] | $4,322,844,989.35 |

Id. at 84464.

The SSAC explained that "the major difference between Vertex and AAR came down to overall quality, where Vertex had no adverse performance quality ratings and AAR had Unknown performance quality for their one (1) subcontractor [* * *] . . . and ha[d] adverse performance issues on one (1) contract [the [* * *] contract]." Id. at 84469–70. Although Vertex's price was 23.6% or $824,042,462.80 higher than AAR's, the SSAC opined that "the advantages of Vertex's superior past performance with no adverse performance issues are beneficial enough to the Government to justify Vertex's higher price." Id. at 84473. The SSAC

9

also noted that, under the RFP, Past Performance was significantly more important than Price. Id. at 84474. It recommended the award be made to Vertex whose proposal it determined offered the best overall value to the government. Id.

**2.    The Source Selection Authority**

The Source Selection Authority ("SSA") concurred with the SSEB's determinations and SSAC's recommendation that the contract be awarded to Vertex. AR Tab 184 at 84478, 84480–83. He explained that "[i]n accordance with the RFP" he viewed Factor 2 (Past Performance) as "significantly more important" than Factor 3 (Price). Id. at 84481.

The SSA concluded that both AAR and Vertex were superior to [* * *] with respect to performance quality, based on "multiple adverse issues on [[* * *]'s] most relevant and recent contract, the [COMBS III] effort." Id. at 84482. As between AAR and Vertex, the SSA found Vertex's performance quality superior. While AAR had been assigned an overall "Satisfactory Confidence" rating, he observed, "[it] ha[d] adverse performance issues on one (1) contract related to Supply Chain Management where Marginal ratings were documented and the PPET assigned an overall Marginal rating." Id. In addition, the SSA explained, "AAR's subcontractor was given an Unknown performance quality as no past performance quality information could be obtained, which may introduce risk in AAR's performance." Id. By contrast, he observed Vertex was given a "Substantial Confidence" rating "with no adverse performance issues, and received Satisfactory or better on all ratings." Id.

The SSA acknowledged the "price difference of $824,042,462.80 or approximately 23.6% between AAR and Vertex." Id. He also acknowledged that "AAR demonstrated successful performance, leading to a reasonable expectation of successfully performing the effort." Id. Nonetheless, the SSA's tolerance for risk was reduced as a result of the performance issues that had arisen under the existing COMBS III contract. He explained that "[t]he T-6 COMBS program has struggled with poor performance" and that performance issues had "negatively impacted aircraft availability and pilot production." Id. at 84483. Therefore, he observed, in his judgment, it was "imperative to select an awardee with the capability to successfully perform, so the program may begin to recover." Id. Referring to Vertex's proposal, he observed that "superior past performance with no adverse performance issues is strongly valued as it provides greater assurance for program recovery and parts availability, and merits a tradeoff despite the significant price difference." Id.

Invoking what he characterized as "the current state of the T-6 COMBS program," the SSA stated that, "in [his] judgment, th[e] program cannot risk continued issues related to performance." Id. "Therefore," the SSA determined, "the perceived benefits provided by Vertex in performance quality do warrant a tradeoff for the additional $824,042,462.80, which is approximately 23.6% higher than AAR." Id. He found Vertex's proposal to be "the best value to the Government due to their superior performance on relevant contracts with no adverse performance issues." Id.

10

### III.    This Action

On September 5, 2025, AAR filed its Complaint in this court. Compl., ECF No. 1; see also Am. Compl., ECF No. 41. On November 5, 2025, AAR filed its MJAR. Pl.'s MJAR, ECF No. 39. Vertex and the government filed their cross-motions on November 19, 2025. Def.-Intervenor's Cross-MJAR, ECF No. 42; Def.'s Cross-MJAR, ECF No. 43. The Court held oral argument on January 28, 2026. See Min. Entry (Jan. 28, 2026).

### DISCUSSION

### I.    Jurisdiction and Statutory Standing

The Court of Federal Claims has subject-matter jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, and as relevant here, the court has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b).

A plaintiff has statutory standing to bring a protest where they are an "interested party"—i.e., "an actual or prospective bidder . . . whose direct economic interest would be affected by the award of the contract." Percipient.AI, Inc. v. United States, 153 F.4th 1226, 1243 (Fed. Cir. 2025). In a post-award bid protest, a protestor has a direct economic interest if it had a "substantial chance" of winning the award independent of any error in the procurement process. REV, LLC v. United States, Aptive Res., LLC, 91 F.4th 1156, 1164 n.2 (Fed. Cir. 2024). An interested party must also establish prejudice by showing it would have had a substantial chance of winning the award "but for the alleged error in the procurement process." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citing Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006).

Under this precedent, AAR is an interested party within the meaning of 28 U.S.C. § 1491(b)(1) and had a substantial chance of winning the award but for the alleged errors in the procurement process. If the Court agreed that it was arbitrary and capricious for the Agency to find Vertex's price proposal reasonable, then the award to Vertex would be set aside. As compared to the remaining competitor, [* * *], AAR would have had the highest rated proposal in terms of past performance, with only a slightly higher price. Similarly, if AAR's objections to the ratings assigned to its and Vertex's past performance were found valid, then it would be placed on an equal footing with Vertex in terms of past performance, with a significantly lower price. In short, if its protest grounds were found valid, AAR would have had a substantial chance of winning the award. Therefore, AAR has standing to bring this claim.

### II.    Motions for Judgment on the Administrative Record

The court reviews bid protests on the basis of the administrative record. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed Cir. 2009); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). Parties may move for judgment on the

administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Bannum, 404 F.3d at 1357.

The court's inquiry in ruling on a motion for judgment on the administrative record is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." XOtech, LLC v. United States, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020) (quoting Palantir USG, Inc. v. United States, 904 F.3d 980, 989 (Fed. Cir. 2018)). Unlike a summary judgment proceeding, genuine issues of material fact do not foreclose the entry of judgment on the administrative record. Bannum, 404 F.3d at 1356.

## III.    Scope of Review

The court reviews agency procurement decisions under the standards used to evaluate agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4); Percipient, 153 F.4th at 1238–39. As such, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4)); see also 5 U.S.C. § 706(2)(A).

This "highly deferential" standard of review requires a reviewing court to "sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). The Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Its review is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (noting that a court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action").

Under this narrow standard of review, a disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. See Impresa, 238 F.3d at 1338. For the agency to prevail, it need only articulate a "rational connection between the facts found and the choice made," and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (first quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); then quoting Bowman Transp., 419 U.S. at 286). Thus, the agency's action will only be set aside where the court is persuaded that the agency either "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

12

before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.

## IV.    Price Reasonableness Determination

As noted above, the Solicitation required that proposals be evaluated for price reasonableness. AR Tab 71b at 71835. AAR argues that the Agency's conclusion that Vertex's price was reasonable, "where that price was over $1 billion higher than the IGE and $824 million higher than AAR's proposed price, was fundamentally flawed and rendered the Agency's consideration of price meaningless." Pl.'s MJAR at 22. It identifies a number of quarrels it has with the Agency's methodology and what it contends was a failure by the Agency to sufficiently explain its reasoning. None of its contentions provide a basis for the Court to reject the Agency's exercise of its discretion with respect to price reasonableness.

The point of a price reasonableness analysis is "to protect the public from paying a price that is too high for what is being procured." DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1311 (Fed. Cir. 2021). However, "what exactly is 'reasonable' is a judgment based on the specifics of the government's needs." Id. at 1310. Therefore, "agencies enjoy wide latitude" when evaluating price reasonableness. Id. (quoting Agile Defense, Inc. v. United States, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020)). It is not the Court's function to second guess the Agency's determination. Rather, its function is to ensure that the Agency has not engaged in arbitrary decision making and that it has documented its reasoning. See Tolliver Grp., Inc. v. United States, 172 Fed. Cl. 581, 595 (2024) (holding that "as long as the agency had a rational basis for reaching its price reasonableness conclusion, the Court must uphold the finding" (citing Moore's Cafeteria Servs. v. United States, 77 Fed. Cl. 180, 186–87 (2007)).

Consistent with the latitude granted to agencies, the FAR "leaves the choice of price-analysis technique to a contracting officer's reasonable judgment in the context of an individual procurement." DynCorp, 10 F.4th at 1310. The FAR identifies two "preferred techniques." FAR 15.404-1(b)(3). The first involves comparing proposed prices received in response to the solicitation to each other. FAR 15.404-1(b)(2)(i). Use of that method is based on the expectation that "[n]ormally, adequate price competition establishes a fair and reasonable price." Id. The other preferred technique is to compare "proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items." FAR 15.404-1(b)(2)(ii). In addition, while not identified as a "preferred" technique, an agency may conduct an analysis of "data other than certified cost or pricing data" to determine price reasonableness. FAR 15.404-1(b).

In this case, the Agency employed all three of these price evaluation techniques in determining the reasonableness of Vertex's proposed TEP and used the second and third techniques to assess the reasonableness of the offerors' proposed prices at the CLIN level. See infra section III.C.1. Its decision not to also perform a value analysis, see Pl.'s MJAR at 25, is one committed to the Agency's discretion under the FAR and applicable precedent.

As described above, the RFP requested pricing for 128 CLINs. For 102 of the 128 CLINs, the government used the IGE it developed as a benchmark, but for the remaining 26 CLINs (including the PPFH CLINs which accounted for a significant portion of the contract

price), the Agency used the mean price offered as a benchmark. See AR Tab 177 at 83952–55. For the first set of CLINs, the Air Force issued an EN to offerors when the proposed CLIN unit price deviated from the IGE unit prices by more than 25%, and for the 26 outlier CLINs the Agency issued an EN where there was a 15% difference from the mean price offered. See id.

Applying these benchmarks, the PET issued initial ENs to the three offerors in the competitive range. AR Tabs 133–35 (Initial EN Reports); AR Tabs 99–101 (Discussion Briefs). Follow-on ENs were also issued. See, e.g., AR Tabs 142, 144, 154–58 (additional EN documents). The PET carefully considered Vertex's responses to the ENs and concluded that Vertex had "provided sufficient rationale and support for all proposed prices that exceeded the 15% or 25% threshold, addressing the Government's concerns related to price reasonableness." AR Tab 174 at 83724. The PET explained its reasoning regarding Vertex's pricing in a 110-page report, which evaluated the reasonableness of each of Vertex's 128 proposed CLIN prices. See id. at 83718–827.

AAR's contention that the PET conducted "a bare comparison of percentage differentials in price, without any further analysis" therefore lacks merit. Pl.'s MJAR at 25 (quoting Fluor Intercontinental, Inc. v. United States, 147 Fed. Cl. 309, 336 (2020)). The PET, as noted, based its determination that Vertex's prices were reasonable at the CLIN level on the application of two techniques—comparison to the mean and consideration of the adequacy of Vertex's price justifications. As the PET explained, "[t]he 15% or 25% higher threshold was a starting point for discussions [and] was not intended to be a hard cutoff in order to determine CLIN prices to be reasonable." AR Tab 174 at 83725.

The PET also conducted an appropriate analysis of the reasonableness of Vertex's TEP. It compared the TEP in Vertex's final revised proposal and found that it was "approximately 23.9% higher than the Government estimate that includes the mean pricing for 26 of the CLINs and the IGE for all other CLINs." Id. The PET also compared Vertex's proposed TEP to the TEP of the other Offerors in the competitive range and found that Vertex's TEP was "approximately 23.8% higher than that of the lowest-priced offer of $3,490,610,519 and 23.6% higher than the middle-priced offer of $3,498,802,527." Id.

Based on these findings, the PET determined that "Vertex's TEP was within a reasonable range compared to the other Offerors." Id. Its determination was also based on an analysis of the pricing data Vertex provided as part of its price proposal, as well as Vertex's EN responses, its updated Pricing Matrix, and its final proposal. Id. As the PET explained, offerors had been required to provide "a comprehensive rationale for their pricing, to include assumptions, historical data, projections, expertise, and management decisions." Id. It concluded that "[Vertex's] proposal satisfied this requirement, offering a thorough explanation of their price development process." Id. That characterization of the process Vertex used to develop its prices is consistent with the record. See, e.g., id. at 83725–26 (providing a detailed description of information Vertex provided about its process).

Finally, the Court notes that the more than $800 million difference between Vertex's TEP and that of AAR is not as remarkable as AAR would have the Court believe. The contract price was based on a performance period of almost ten years. See AR Tab 61 at 68076–77. Vertex's TEP was less than 24% higher than AAR's. The court has frequently upheld agency

14

determinations that price premiums of this size and greater were reasonable. See, e.g., Tolliver Grp., Inc., 172 Fed. Cl. at 597 (upholding determination that price premium of 26–28% was reasonable); ASRC Fed. Tech. Sols., LLC v. United States, 169 Fed. Cl. 372, 380, 389 (2024) (rejecting price reasonableness challenge where awardee's price was approximately 57% higher than protester's); AMES 1, LLC v. United States, 162 Fed. Cl. 1, 25 (2022) (rejecting price reasonableness challenge where awardees' prices were 33.9% and 42% above the mean); Partner 4 Recovery v. United States, 141 Fed. Cl. 89, 121, 126 (2018) (upholding determination that a price premium of 19.6% higher than the second highest offeror, 33.9% higher than the third highest offeror, and 53% higher than the lowest offeror was reasonable).

In short, the Agency relied upon multiple techniques for determining price reasonableness, conducted several rounds of discussions with the offerors regarding price reasonableness, explained its reasoning in detail, and reached a rational conclusion. AAR's challenge to the Agency's price reasonableness determination therefore lacks merit.

## V.      Past Performance

### A.      The Agency's Determinations

As described above, the PPET concluded that AAR had demonstrated "a combined past performance in all areas of scope, magnitude, complexity, and price compared to the [] COMBS IV effort." AR Tab 182 at 84449. It rated two of AAR's past performance examples "Satisfactory" for quality and one as "Marginal." Id. at 84450. It assigned an "Unknown" rating to the past performance of AAR's subcontractor [* * *]. Id. Based on these determinations, the Agency gave AAR a "Satisfactory Confidence" performance rating reflecting that—given AAR's past performance—the Air Force had a "reasonable expectation" that AAR would successfully perform the contract. Id.

The PPET concluded that Vertex had also demonstrated "a combined past performance in all areas of scope, magnitude, complexity, and price compared to the [] COMBS IV effort." Id. at 84460. But it assigned Vertex a higher "Substantial Confidence" rating based on a combination of past performance examples that were deemed of "Satisfactory" quality and one that was judged "Exceptional." Id. at 84459–60. Moreover, "[t]here were no adverse performance issues identified" with respect to Vertex. Id. at 84460. These findings, the Agency stated, left it with "a high expectation the Vertex team will successfully perform the [] COMBS IV program requirements." Id.

AAR argues that its past performance record should have garnered it a "Substantial Confidence" rather than "Satisfactory Confidence" rating. See Pl.'s MJAR at 29. It contends that the Agency should not have determined that AAR's performance on its [* * *] contract was "Marginal." Id. at 29–32. It further contends that the Agency evaluators improperly penalized AAR for its subcontractor's "Unknown" past performance quality. Id. at 32–33.

AAR's assertions regarding its own performance confidence ratings relate to matters that are generally committed to agency discretion. Courts give "'the greatest deference possible . . . to the agency' when reviewing an agency's evaluation of an offeror's past performance." NARCORPS Specialties, LLC v. United States, 177 Fed. Cl. 535, 546 (2025) (quoting Dynamic

Sys. Tech., Inc. v. United States, 127 Fed. Cl. 551, 562 (2016)). "Evaluation of experience and past performance, by its very nature, is subjective[,] and an offeror's mere disagreement with an agency's evaluation judgments does not demonstrate that those judgments are unreasonable." SOFITC3, LLC v. United States, 178 Fed. Cl. 194, 208 (2025) (alteration in original) (quoting Gritter Francona, Inc. v. United States, 158 Fed. Cl. 597, 608 (2022)).

Given its narrow scope of review, the Court declines to second guess the Agency evaluators' determinations regarding whether the offerors' past performance records left them with a "substantial" expectation of successful performance or instead a "reasonable" one. The Court's function is to ensure that the Agency complied with the RFP's requirements, reviewed and considered the past performance information before it, treated offerors equally, and reached conclusions that were not irrational. Those requirements have been met here.

The record reflects that the PPET conducted a review of the references listed in each offeror's proposal, and collected available PPQs and CPARS. See, e.g., AR Tabs 112–31 (PPQs); AR Tabs 189–235 (CPARS). The PPET assessed these materials based on the RFP's criteria to arrive at overall ratings, considering recency, relevancy (including scope, magnitude, complexity, and price), and performance quality. Compare AR Tab 188 at 84623–723 with AR Tab 71b at 71831–35. The PPET then issued ENs to each offeror, raising questions or concerns identified in its initial review. See, e.g., AR Tab 159 (AAR ENs); AR Tab 165 (Vertex ENs). The PPET considered those EN responses, obtained additional PPQs and CPARS where relevant, and prepared a 92-page Past Performance report that explained its conclusions based on the RFP's evaluation criteria. See AR Tab 181 at 84355–446. In short, the Agency satisfied its obligations to engage in reasoned decision making with respect to the assignment of confidence ratings.

### B.    Specific Objections to the Agency's Evaluation of AAR's Past Performance

AAR's specific objections to the Agency's past performance and confidence ratings also lack merit. For example, AAR challenges the Air Force's conclusion that its performance on the [* * *] contract was "Marginal." It points out that its "CPARS have consistently rated AAR's performance across evaluation areas as 'Satisfactory' and 'Very Good,' and AAR has never received a 'Marginal' rating." Pl.'s MJAR at 29 (citing AR Tabs 219, 224, 229).

But the Agency was not unaware of AAR's positive CPARS ratings. AR Tab 181 at 84372 (noting the Agency reviewed one PPQ and three CPARS and that "[t]he CPARs were rated Satisfactory to Very Good for most areas"). However, it was concerned about a PPQ that documented six marginal ratings in three areas: Program Management, Supply Chain Management, and Price Performance. Id. It therefore followed up about its concerns by interviewing the evaluator for the [* * *] contract. Id. at 84373. The evaluator "confirmed that there were issues with the day-to-day performance of the contractor meeting metrics." AR Tab 159 at 82921. The evaluator also advised the PPET that AAR's turn-around times of up to eighteen months for engine repairs were impacting its ability to meet requirements and aircraft availability. Id.

The PPET did not just take the evaluator's word for it. It issued an EN to AAR regarding its performance on the [* * *] contract. AR Tab 135 at 82193–94. AAR's response to the adverse

16

performance information in relation to Program Management and Price Performance assuaged the PPET's concerns about those areas. AR Tab 159 at 82929; see also id. at 82921–28 (AAR's response). But the PPET concluded that "the rationale provided in the EN [response] did not completely address the Government's concerns for [] Supply Chain Management." Id. at 82929. It therefore conducted a second interview with the same [* * *] contract evaluator in October 2024. AR Tab 181 at 84374. He advised the PPET that "aircraft mission capability and delivery of parts continue to be problematic." Id.

In light of the evaluator's observations, the PPET explained, it was "not fully confident [AAR] w[ould] strive to meet the Government's requirement for supply chain management and avert future adverse performance." AR Tab 159 at 82929. As the PPET observed in its report, AAR's performance in supply chain management involved "engine delays and one for one exchange in commercial pull parts." AR Tab 181 at 84358. The PPET noted that the "COMBS IV contract will rely heavily on commercial partners and not on organic supply, and these current issues in Supply Chain Management for part delays are a significant concern for the PPET." Id. Further, "the PPET determined the corrective action implemented was only 'marginally effective.'" Id. Therefore, it assessed a performance quality rating of "Marginal" and closed the EN. AR Tab 159 at 82929.

AAR argues the Agency failed to consider that "the 2023 CPARS confirmed that AAR had addressed" the PPQ evaluator's concerns. See Pl.'s MJAR at 30–31 (citing AR Tab 229 at 85451). But the CPARS in question covered AAR's performance in 2023, AR Tab 229 at 85449, while the two interviews with the evaluator during which he spoke of continuing problems, occurred in 2024, see AR Tab 159 at 82921. In any event, to the extent a conflict existed, it was up to the Agency to decide which source to credit. Nothing in the Solicitation or the FAR requires the Agency to give preference to CPARS ratings over PPQs or interviews of evaluators.[3]

AAR next argues the Agency improperly used its subcontractor's "Unknown" past performance quality "as a basis to downgrade AAR's overall Past Performance rating and penalize AAR in the best value tradeoff." Pl.'s MJAR at 32–33. It is well established, however, that an agency may treat an "Unknown" rating as worth less than satisfactory or exceptional ratings in a best value tradeoff. See, e.g., Advanced Tech. Sys. Co. v. United States, 177 Fed. Cl. 443, 457 (2025); Bahr. Mar. & Mercantile Int'l BSC (C) v. United States, 118 Fed. Cl. 462, 480 n.13 (2014); Def. Base Servs., Inc. v. United States, 147 Fed. Cl. 424, 440 (2020); Precision Images, LLC v. United States, 79 Fed. Cl. 598, 625 (2007). Therefore, the Agency acted within

---

[3] In a footnote, AAR argues that the Agency violated FAR 15.306(d)(3) because it did not give AAR another opportunity to respond, this time to the follow-on interview. Pl.'s MJAR at 30 n.11. But AAR was given an opportunity to address concerns related to supply chain management on the [* * *] contract in an EN, and it took advantage of that opportunity. AR Tab 159 at 82923–24. And "the government is not obligated to re-discuss items [to] which a bidder has already had an opportunity to respond." Dolphin Park TT, LLC v. United States, 162 Fed. Cl. 248, 270 (2022) (quoting WorldTravelService v. United States, 49 Fed. Cl. 431, 439–40 (2001)); see also FAR 15.306(d)(3) ("[T]he contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.").

its discretion here when it found that the absence of any past performance quality information about [* * *] "introduce[d] risk in AAR's performance." AR Tab 184 at 84482.

Further, it is unclear that AAR was harmed by any consideration of [* * *]'s lack of performance quality information. The Agency's conclusion that AAR's performance on the [* * *] contract was "Marginal" is sufficient in and of itself to support a less than "Substantial Confidence" rating. See id. ("The major concern with the adverse performance issues were related to Supply Chain Management and participation in parts pull.").

### C.    Challenges to Vertex's Past Performance Evaluation

AAR also contests the Agency's evaluation of Vertex's Past Performance. Specifically, it contends that the Agency "unreasonably supplemented" and "bolstered" Vertex's Past Performance record by considering three additional contract references which Vertex supplied in response to an EN. Pl.'s MJAR at 33. AAR further argues that the additional references, which the Agency determined were "Somewhat Relevant," should have been found "Not Relevant." Id.

AAR's contentions lack merit. As described above, during its evaluation, the Agency determined that the three references Vertex initially provided were not comparable in magnitude to the COMBS IV contract because they involved smaller numbers of aircraft. AR Tab 135 at 82211; AR Tab 188 at 84696 (finding "Vertex demonstrated performance in dollar value of parts managed, size of parts inventory managed, and contract value" but "did not demonstrate performance in size of aircraft fleet(s)"). The Agency requested additional information from Vertex in an EN. AR Tab 135 at 82211. In response, Vertex identified three additional contract references for which it had supported and maintained larger fleets of aircraft. See AR Tab 165 at 83175–78. The Agency then collected and reviewed PPQs and CPARS for the three references and, based on its review, concluded that the additional references were each "Somewhat Relevant," AR Tab 181 at 84434–46, i.e., they "involved some of the scope and magnitude of effort and complexities this solicitation requires," AR Tab 71b at 71833.

The Agency acted within its discretion when it considered the additional references and assigned a "Somewhat Relevant" rating to them. The Solicitation expressly stated that the Agency "reserve[d] the right to use all information available to fully assess the Offeror's past performance." AR Tab 71b at 71832 (emphasis added). It also stated the Agency's review would not be limited to information provided by offerors but could also consider "information obtained from other sources," such as the PPQs and CPARS the Agency collected concerning the additional references. Id.

Nor is there any merit to AAR's claim that the Agency should have determined that the three additional references were, in any event, "Not Relevant." Determinations regarding the degree of similarity between past performance examples and the contract that is the focus of the procurement are subjective and lie within the expertise of the Agency. Def. Base Servs., Inc., 147 Fed. Cl. at 436 ("The FAR entrusts to an agency's discretion the determination of what does or does not constitute relevant past performance." (citing Linc Gov't Servs. LLC v. United States, 96 Fed. Cl. 672, 718 (2010), abrogated on other grounds by, Safeguard Base Operations, LLC v. United States, 989 F.3d 1326 (Fed. Cir. 2021))).

18

For example, AAR challenges the Agency's finding that the [* * *] contract ("[* * *] contract") to which Vertex was a party was of similar scope and complexity to the COMBS IV effort. Pl.'s MJAR at 35–36. AAR contends that this finding is inconsistent the information Vertex provided in response to the EN which, AAR asserts, revealed that the [* * *] contract did not include supply chain management. Id. (citing AR Tab 166 at 83204–05). But the Agency reasonably concluded that a number of the tasks performed did fall under that rubric. In its response to the EN, Vertex explained that it was "not required to manage aircraft parts on the [* * *] program" or to warehouse aircraft parts. AR Tab 165 at 83177. However, it stated, it was required to "order all parts and materials for I-level repair of systems, components, and equipment on the [* * *] program via NALCOMIS/OIMA and via direct vendor acquisition." Id. The PPET rationally concluded that these tasks constituted "Supply Chain Management," AR Tab 166 at 83204, and AAR's mere disagreement with the Agency's classification of those tasks as such does not provide the Court basis to disturb the Agency's reasoned judgment.

Moreover, the Agency found that the [* * *] contract demonstrated relevancy in several additional ways. Id. (finding similarity in "TCI and Major Time Change Items (MTCI) Management, Subcontract Management . . . and Time Compliance TCTO/Technical Directive (TD) Management," as well as number of aircraft, "Transition Approach," "Performance, Trend Analysis and Reliability and Maintainability and [] Approach for Small Business Participation"). AAR does not dispute that the record supports these findings. Cf. AR Tab 150 at 82452–53. It was therefore within the Agency's discretion to find the contract "involved some of the scope and magnitude of effort and complexities this solicitation requires"—rather than "little or none"—and to rate the contract as "Somewhat Relevant" accordingly. AR Tab 71b at 71833.

Similarly unpersuasive is AAR's claim that the Agency's assignment of a "Satisfactory" rating to Vertex's past performance related to its [* * *] ("[* * *] contract") was flawed. Pl.'s MJAR at 37–41. As part of its evaluation of this contract, the Agency reviewed two PPQs and seven CPARS. AR Tab 181 at 84421. The PPQs were generally rated satisfactory to exceptional, but there were five marginal ratings assigned for Program Management, Supply Chain Management, and Price Performance. Id. The PPET examined the PPQs and noted that most of the negative issues occurred within the first six months and first two years of the contract. Id. at 84422. It observed that in the last four years Vertex's performance had placed the [* * *] system in "the Top Five (5) in Aircraft Availability, Mission Capable rate and [Total Not Mission Capable Supply] rate" among comparably-sized Air Force fleets. Id. at 84421–22. The Solicitation allowed the Agency to credit Vertex for its successful corrective action. AR Tab 71b at 71834.[4]

Thus, the Agency acknowledged all of the adverse performance issues to which AAR now points. Cf. Pl.'s MJAR at 37–39. In addition, the Agency properly took into consideration that later CPARS suggested performance issues were corrected. Contrast AR Tab 190 at 84764

---

[4] The PPET also acknowledged negative findings in Vertex's early CPARS, but concluded, "[b]ased on later CPARs" that "all identified performance issues were corrected to the satisfaction of the Government." AR Tab 181 at 84422–23. The PPET therefore concluded there were "no adverse performance issues" and, as noted, rated the reference as "Satisfactory." Id. at 84423.

with id. at 84812. AAR's argument amounts to mere disagreement with the Agency's determinations and is not a basis for setting aside the award.

## VI.    Best Value Determination

Finally, AAR challenges the Agency's best value determination. It contends the Agency did not give sufficient weight to price when it performed its analysis and that its willingness to pay a 24% price premium to contract with Vertex unduly elevated the importance of what AAR calls a "nominal" past performance difference. Pl.'s MJAR at 42; see also id. at 43 ("There was no meaningful difference in terms of performance risk between AAR's 'Satisfactory Confidence' rating and Vertex's 'Substantial Confidence' rating.").

But the Agency was required to assign greater weight to performance than price under the RFP. It stated that Past Performance would be "considered significantly more important" than Price. AR Tab 71b at 71829 (emphasis added). The RFP also cautioned that the priority assigned to Past Performance "may result in an award to a higher rated, higher priced Offeror, where the . . . superior past performance of the higher priced offeror outweighs the price difference with lower priced offerors." Id. at 71827.

It is "within the agency's discretion to determine how much of a price premium it [is] willing to pay in light of the perceived benefits of each proposal." Tech. Innovation All. LLC v. United States, 149 Fed. Cl. 105, 160 (2020). Here, in the view of the Air Force, "[t]he significance of successful past performance [was] paramount." AR Tab 184 at 84483. As discussed in more detail above, the Agency was of the view that "[t]he T-6 COMBS program ha[d] struggled with poor performance which has[d] negatively impacted aircraft availability and pilot production." Id. AAR, in fact, does not take issue with this observation. Therefore, the Agency acted within its discretion when it awarded the contract to Vertex, based on the quality of its past performance and notwithstanding the price premium.

## CONCLUSION

For the reasons discussed above, in a January 30, 2025 Order, the Court denied AAR's Motion for Judgment on the Administrative Record, ECF No. 39, and granted the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 43, and Vertex's Cross-Motion for Judgment on the Administrative Record, ECF No. 42. Order, ECF No. 47. It now directs the Clerk to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

20